IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| AMANDA LAWTON,<br><br>Plaintiff,<br><br>v.<br><br>MENARD, INC.,<br><br>Defendant. | Civil Action No.<br>_______________<br><br>JURY TRIAL DEMANDED |

## **VERIFIED COMPLAINT**

COMES NOW, Amanda Lawton ("Plaintiff" or "Ms. Lawton"), by and through her undersigned counsel, and files this, her Complaint, and shows the Court as follows:

## **NATURE OF COMPLAINT**

1. Plaintiff brings this action for damages and reasonable attorney fees against Defendant Menard, Inc. ("Defendant" or "Menard's") for violations of her rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII").

2. This action challenges Defendant's discriminatory treatment of Plaintiff on the basis of her sex, and Defendant's retaliation against Plaintiff for opposing that discrimination, culminating in the termination of her employment one day after she

complained that her General Manager was discriminating against her because of her gender, in violation of Title VII.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action arises under federal law, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(4), which provides for jurisdiction in actions to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Plaintiff was employed by Defendant in this judicial district and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this judicial district and division.

## ADMINISTRATIVE PROCEDURES

5. Plaintiff has fulfilled all conditions precedent necessary to proceed with this cause of action under Title VII. On October 22, 2025, within 300 days of her termination, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Menard, Inc., Charge Number 560-2026-00220, alleging discrimination on the bases of sex and retaliation. The charge was dual-filed

with the Missouri Commission on Human Rights. The EEOC issued its Determination and Notice of Rights on July 24, 2026, and Plaintiff timely files this Complaint within ninety (90) days of the issuance and her receipt of that notice.

## PARTIES

6. Plaintiff Amanda Lawton is a female, a citizen of the United States, and a resident of Missouri. At all relevant times, Plaintiff was employed by Defendant from on or about October 2, 2017, until her termination on August 5, 2025.

7. Defendant Menard, Inc., doing business as Menards, is a Wisconsin corporation with its principal place of business at 5101 Menard Drive, Eau Claire, Wisconsin 54703. At all times material hereto, Defendant owned and operated a retail store located at 1700 S. Hanley Road, Saint Louis, Missouri 63144, where Plaintiff was employed, and has conducted business within this District and Division.

8. During all times relevant hereto, Defendant has been an employer engaged in an industry affecting commerce and has employed more than five hundred (500) employees for each working day in each of twenty or more calendar weeks in the current and preceding calendar years.

9. Defendant is therefore an "employer" as defined under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

10. Defendant may be served with process by delivering a copy of the summons and complaint to its registered agent for service of process, located at 5101 Menard Drive, Eau Claire, Wisconsin 54703.

## FACTUAL ALLEGATIONS

11. Plaintiff was hired by Defendant at its Richmond Heights store on or about October 2, 2017, as a Receiver.

12. Over the next eight years, Plaintiff faithfully performed the duties of the various positions she held at the store. At the time of her termination, Plaintiff was employed as a Plan-O-Gram Team Member, working four days per week at a rate of $17.75 per hour and earning approximately $2,200 per month.

13. Throughout her approximately eight years of employment with Defendant, Plaintiff received only a single, minor disciplinary infraction. That write-up was issued in 2022 by a department manager, not a General Manager, and arose from a disagreement about watering plants.

14. James Creviston III became the General Manager of the Richmond Heights store approximately four months before Plaintiff's termination.

15. Plaintiff is a single mother. From the start of her employment, her work schedule was arranged around her son's schedule, an arrangement every General Manager before Mr. Creviston honored.

16. After he became General Manager, Mr. Creviston questioned Plaintiff about her requested days off, her child's age, her home situation, and her ability to arrange childcare while she worked. No General Manager had questioned her about these matters before.

17. Throughout her employment, and with increasing frequency after Mr. Creviston became General Manager, Plaintiff experienced a pattern of exclusion from key communications and leadership opportunities at the store because of her sex.

18. On multiple occasions, Mr. Creviston communicated only with Plaintiff's male colleagues about work assignments, even though Plaintiff was often the lead team member on those assignments. He routinely went to a male co-worker, Steven, for status updates on planograms that Plaintiff was leading.

19. At the store, the team member who starts a planogram has always been its lead. On one occasion, within an hour of Steven joining Plaintiff on a planogram she had started, Mr. Creviston made Steven the lead.

20. For example, during the week of July 20, 2025, Mr. Creviston came to the area where Plaintiff was working multiple times to check on the progress of the work but spoke only to Plaintiff's male colleague, Steven, who was not in charge of or supervising the work. Steven later boasted to Plaintiff that Mr. Creviston was talking to him and not to her.

21. That same week, Plaintiff asked Mr. Creviston for the beam heights she needed for an electrical planogram. Rather than answer her, Mr. Creviston called Steven to the office and gave the beam heights to him, although Plaintiff was working on the floor nearby.

22. Mr. Creviston rolled his eyes at Plaintiff when she asked work-related questions and dismissed her safety concerns. In late July 2025, when Plaintiff warned him that a recliner had been placed on a shelf approximately 68 inches high and that "someone is going to get hurt badly," Mr. Creviston replied that the store would not "get in trouble" because corporate wanted it that way.

23. Mr. Creviston also made disparaging remarks about the appearance of female employees, including telling a female department manager that he did not like the way she looked.

24. In accordance with Defendant's complaint procedures, Plaintiff raised her concerns of sex discrimination with the Second Assistant General Manager, Alexa Grimsley.

25. In late July 2025, Plaintiff asked Ms. Grimsley why Mr. Creviston was ignoring her and speaking only to Steven. Ms. Grimsley told Plaintiff that other female team members had reported the same concern about Mr. Creviston, and that she would talk to him.

26. Shortly afterward, Plaintiff told Ms. Grimsley again that Mr. Creviston engaged only with Steven and that this was not fair treatment. Ms. Grimsley again acknowledged the complaint, said that other team members had shared similar observations and concerns, and said that she would talk to him.

27. Plaintiff further raised her concerns with the First Assistant General Manager, Heath Scholle, a supervisor further up the management chain, to ensure that her concerns were heard and appropriately addressed.

28. Defendant's Equal Employment Opportunity Policy (Policy & Procedure #31) provides that when a team member first makes a complaint to an immediate supervisor, "the supervisor must report all information received from the Team Member . . . to the Unit Manager and Human Resources," and that any manager or supervisor who knows of a discriminatory work environment "must notify the Unit Manager immediately, without exception." Neither of Plaintiff's complaints was forwarded on.

29. On the morning of August 4, 2025, after Mr. Creviston again bypassed Plaintiff to get status updates from Steven on a planogram she was leading, Plaintiff told the Assistant Hardware Manager that Mr. Creviston was sexist, and she asked to meet with Mr. Creviston and Ms. Grimsley to resolve the problem.

30. In that meeting, Plaintiff told Mr. Creviston that she was frustrated that status updates were requested from Steven every time she was the lead on a planogram. Mr. Creviston responded, "I do not care. You complain too much. I am done with you."

31. After the meeting, Ms. Grimsley apologized to Plaintiff for Mr. Creviston and said she would talk to him again. Later that day, Ms. Grimsley told Plaintiff that Mr. Creviston had brushed her off.

32. At approximately 12:46 p.m. on August 4, 2025, Plaintiff made a complaint to Mr. Scholle, the First Assistant General Manager, stating clearly that her supervisor, Mr. Creviston, was treating her poorly and discriminating against her because of her sex, and telling him that Mr. Creviston was sexist. Mr. Scholle responded, "You complain too much," and the complaint was not forwarded to the Unit Manager or Human Resources.

33. Plaintiff told Mr. Scholle that she needed to talk to Human Resources. She left work at approximately 1:00 p.m.

34. The next day, on August 5, 2025, when Plaintiff returned to work for a new shift, she was summoned over the store's paging system at approximately 9:30 a.m. to the back office, where Mr. Creviston and another manager, Wallcoverings Department Manager Carla Hayes-Gowen, met with her privately.

35. Defendant's termination form for Plaintiff is dated August 5, 2025, at 8:59 a.m., before Plaintiff was summoned to the office and before she was given any opportunity to respond. The decision to terminate her had already been made.

36. Mr. Creviston opened the meeting by accusing Plaintiff of "starting rumors" that he and Mr. Scholle were sexist. Plaintiff was terminated during that meeting. The "rumors" were Plaintiff's complaints to her supervisors about gender discrimination.

37. When Plaintiff attempted to communicate her concerns of gender discrimination and retaliation during the termination meeting, she was interrupted and told, "we are moving on." When she persisted, and asked for another General Manager and for Human Resources, Mr. Creviston told her repeatedly, "I do not care."

38. Plaintiff was given no written or verbal warnings regarding her conduct prior to her termination. She was pressured to sign an exit form, which she refused, and she was not given a copy of her exit form or an exit interview letter. She did not see the termination form until it surfaced in connection with her claim for unemployment benefits.

39. The termination form does not mention rumors. It states that Plaintiff "consistently has a poor attitude," "complains," and "creates a negative environment around her," and that she had been "spoken with on numerous occasions about her negativity," although Plaintiff had never received a warning of any kind.

40. Before the EEOC, Defendant gave a different reason: that Plaintiff violated a work rule against interfering with orderly workflow by "spreading rumors about store management." Defendant admitted that Plaintiff "was only terminated after it was brought to management's attention on August 5, 2025, that [Plaintiff] had already told multiple coworkers that Creviston was sexist towards women."

41. Defendant also told the EEOC that it had "no other prior notice" of Plaintiff's concerns, which Plaintiff's repeated complaints to Ms. Grimsley and Mr. Scholle contradict, and that Plaintiff was terminated "specifically for this instance of behavior," which its own termination form, citing "numerous occasions," contradicts.

42. On the day of her termination, Plaintiff reported the discrimination and retaliation through Defendant's AWARE hotline. On August 7, 2025, a representative of Defendant's corporate office called her and she gave a statement, and on August 8, 2025, she emailed her written account. She received no response, and no significant action was taken to correct the discrimination and retaliation directed toward her.

43. Defendant later asserted that, when corporate Human Resources spoke with Ms. Grimsley, she "did not relate any concerns about sexism," contrary to what Ms. Grimsley had told Plaintiff on at least two occasions.

44. Plaintiff was treated less favorably in the terms and conditions of her employment than similarly situated male employees who were not members of her protected class.

45. Although Defendant purports to provide legitimate, non-discriminatory reasons for Plaintiff's termination, these reasons are pretextual. They have shifted, they are contradicted by Defendant's own documents, and the stated reasons of poor attitude, complaining, creating a negative environment, and "spreading rumors" can be traced only to Plaintiff's complaints of sex discrimination.

46. Plaintiff's termination was causally connected to her protected activity of opposing sex discrimination.

## PLAINTIFF'S DAMAGES

47. Plaintiff is a single mother. After her termination she had no income. Defendant contested her claim for unemployment benefits, and her claim was denied.

48. In addition to her wages, Plaintiff lost the benefits of her employment, including dental coverage and Defendant's annual profit-sharing payment, which is calculated as a percentage of earnings that increases with length of service. Plaintiff's most recent profit-sharing payment before her termination was approximately $5,000.

49. Plaintiff has diligently sought comparable employment and has kept a record of her applications.

50. Plaintiff was terminated after eight years of service, in front of another manager, and was refused a copy of the termination form. In the days that followed, she learned that people at the store were saying she had been fired for yelling at a manager.

51. Within weeks of her termination, Plaintiff began seeing a counselor because of the emotional distress caused by Defendant's conduct.

52. In the weeks after her termination, Plaintiff lost approximately seventeen pounds, and her anxiety was such that discussing what had happened to her required her to take anxiety medication.

53. The reasons Defendant gave for her termination (poor attitude, negativity, complaining, and "spreading rumors") attack Plaintiff's character and have damaged her reputation and her ability to obtain comparable employment.

54. As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer emotional pain, anxiety, humiliation, damage to her reputation, inconvenience, mental anguish, and loss of enjoyment of life.

## **CLAIMS FOR RELIEF**

## **COUNT I: SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

55. Plaintiff re-alleges and incorporates paragraphs 11 through 54 as if fully set forth herein.

56. Plaintiff is a member of a protected class on the basis of her sex (female).

57. Plaintiff was qualified for her position and faithfully performed the responsibilities of her job.

58. Defendant subjected Plaintiff to adverse employment actions, including exclusion from communications and leadership opportunities and the termination of her employment, because of her sex.

59. Plaintiff was treated less favorably than similarly situated male employees who were not members of her protected class.

60. Defendant's conduct constitutes unlawful discrimination against Plaintiff on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).

61. Although Defendant purports to provide legitimate, non-discriminatory reasons for its actions, these reasons are pretextual.

62. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered economic and non-pecuniary damages, including lost wages and benefits, lost profit-sharing, and emotional pain, suffering, inconvenience, mental anguish,

humiliation, damage to her reputation, and loss of enjoyment of life, for which she is entitled to compensatory damages under 42 U.S.C. § 1981a.

63. Defendant willfully and with reckless indifference disregarded Plaintiff's federally protected rights, entitling Plaintiff to punitive damages pursuant to 42 U.S.C. § 1981a.

## COUNT II: RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

64. Plaintiff re-alleges and incorporates paragraphs 11 through 63 as if fully set forth herein.

65. Plaintiff's complaints of sex discrimination to Ms. Grimsley, Mr. Creviston, and Mr. Scholle, her request to take her complaints to Human Resources, and her statements opposing Mr. Creviston's treatment of women constitute conduct protected under Title VII.

66. Defendant's termination of Plaintiff's employment one day after she complained that her supervisor was discriminating against her because of her gender constitutes unlawful retaliation in violation of Title VII, 42 U.S.C. § 2000e-3(a).

67. A causal connection exists between Plaintiff's protected activity and her termination, as evidenced by the temporal proximity between her complaints and her discharge; the termination form's preparation at 8:59 a.m. the next morning, before

she was given any opportunity to respond; Defendant's admission that it terminated her after learning she had told co-workers Mr. Creviston was sexist; the absence of any prior disciplinary warnings; and Defendant's shifting stated reasons for termination, which can be traced only to Plaintiff's complaints of sex discrimination.

68. Although Defendant purports to provide legitimate, non-discriminatory reasons for Plaintiff's termination, these reasons are pretextual.

69. As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered economic and non-pecuniary damages, including lost wages and benefits, lost profit-sharing, and emotional pain, suffering, inconvenience, mental anguish, humiliation, damage to her reputation, and loss of enjoyment of life, for which she is entitled to compensatory damages under 42 U.S.C. § 1981a.

70. Defendant willfully and with reckless indifference disregarded Plaintiff's federally protected rights, entitling Plaintiff to punitive damages pursuant to 42 U.S.C. § 1981a.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Amanda Lawton respectfully prays for judgment against Defendant as follows:

(a) A trial by jury as to all triable issues of fact;

(b) Back pay, front pay, and other compensatory damages for lost wages and benefits, including lost profit-sharing, from August 5, 2025, through the date of judgment;

(c) Compensatory damages for emotional pain, suffering, inconvenience, mental anguish, humiliation, damage to reputation, loss of enjoyment of life, and other non-pecuniary losses caused by Defendant's unlawful conduct, pursuant to 42 U.S.C. § 1981a;

(d) Punitive damages based on Defendant's willful, malicious, intentional, and deliberate acts in violation of Plaintiff's rights under Title VII;

(e) Declaratory relief establishing that Defendant violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964;

(f) Injunctive relief ordering Plaintiff's reinstatement to her former position, or front pay in lieu thereof, and prohibiting Defendant from engaging in further discriminatory and retaliatory conduct;

(g) Reasonable attorney's fees and expenses of litigation;

(h) Prejudgment and post-judgment interest at the maximum rate allowed by law;

(i) All costs of this action; and

(j) Such other and further relief as this Court deems just and proper.

Respectfully submitted this 22nd day of October, 2026.

**BARRETT & FARAHANY**

s/ *Alexander Gass*

Alan G. Crone Mo. Bar. No. 72845
Alexander Gass Mo. Bar No. 72810
2921 Piedmont Road
Atlanta, GA 30305
acrone@justiceatwork.com
agass@justiceatwork.com

(901) 519-4676 (AGC Direct)
(314) 784-9091 (AWG Direct)

*Counsel for Plaintiff Amanda Lawton*

**VERIFICATION**

I, Amanda Lawton, declare as follows:

1. I am the Plaintiff in this action. I am over eighteen (18) years of age and competent to make this Verification.
2. I have read the foregoing Complaint. The factual allegations in the Complaint concerning myself and my own acts and experiences are true and correct based on my personal knowledge. The remaining factual allegations are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and not made in collusion with the defendant.

Executed on October 22, 2026, in St. Louis, Missouri.

Amanda Lawton (Oct 22, 2026 08:54:41 CDT)

Amanda Lawton